UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES C. WHITWORTH, | |
| Plaintiff, | Case No. 3:17-cv-01121 |
| v. | Judge Aleta A. Trauger |
| CORECIVIC, INC., et al., | |
| Defendants. | |

## MEMORANDUM

This pro se civil rights action under 42 U.S.C. § 1983 arises out of Plaintiff James C. Whitworth's incarceration at two correctional facilities in Tennessee—Trousdale Turner Correctional Center and South Central Correctional Facility—that are operated by CoreCivic, Inc. (CCI), the private for-profit corporation formerly known as Corrections Corporation of America. Whitworth claims that customs and policies implemented by CCI and its contract health-services provider, Correct Care Solutions, LLC (CCS), led to violations of his Eighth Amendment right to receive adequate medical care while incarcerated. (Doc. No. 68.) CCI and CCS have moved for summary judgment on Whitworth's claims. (Doc. Nos. 77, 81.) For the reasons that follow, the defendants' motions will be denied in part and granted in part.

## I.    Factual Background[1]

The facts of this case span more than two years, beginning with Whitworth's incarceration at Trousdale on April 28, 2016, and continuing through his incarceration at South Central, where

---

[1]    The facts in this section are drawn from Whitworth's verified amended complaint, the parties' statements of undisputed material facts, and the exhibits submitted in support of, and in opposition to, the defendants' motions for summary judgment.

he was transferred on May 24, 2017. Whitworth alleges that the defendants' wrongful conduct continued through at least May 2018.

## A.    Trousdale

Whitworth arrived at Trousdale on April 28, 2016, in the custody of the Tennessee Department of Corrections (TDOC). (*See* Doc. No. 110, PageID# 2207, ¶ 5; Doc. No. 121, PageID# 2453, ¶ 3.) At the time Whitworth was incarcerated at Trousdale, CCI contracted with CCS to provide medical services to its inmates. (Doc. No. 110, PageID# 2207, ¶ 3; Doc. No. 123, PageID# 2466, ¶ 59.) Whitworth's medical records traveled with him to Trousdale (*see* Doc. No. 122, PageID# 2459–60, ¶ 16; Doc. No. 68, PageID# 1163, ¶ 19) and showed that he had undergone surgery to fuse his C5 and C6 vertebrae on August 19, 2010, to remedy an injury to his cervical spine (Doc. No. 115-1, PageID# 2370; Doc. No. 122, PageID# 2461, ¶ 20; Doc. No. 123, PageID# 2465, ¶ 54). The defendants do not dispute that Whitworth notified Trousdale health personnel during his intake process about his surgery and that the relevant records could be found in his medical file. (Doc. No. 115, PageID# 2256, ¶ 26.)

According to Whitworth, he repeatedly attempted to communicate with the Trousdale medical staff regarding his need for medical care to prevent another spinal injury from the time he arrived until August 2016. (Doc. No. 68, PageID# 1163, ¶ 18.) Whitworth states that his attempts to do so were hindered because he had very little access to the boxes Trousdale inmates were required to use to submit medical or "sick call" requests and other grievances. (*Id.*; Doc. No. 115, PageID# 2256–57, ¶¶ 17–18, 29.) The defendants do not dispute that there were no such boxes available in either of the housing units to which Whitworth was assigned in 2016. (*See* Doc. No. 115, PageID# 2256, ¶¶ 17–18; Doc. No. 122, PageID# 2457–58, ¶ 11.) The defendants did not install the boxes in Trousdale housing units until the week of April 20, 2017. (*See* Doc. No. 115-

1, PageID# 2394; Doc. No. 122, PageID# 2457–58, ¶ 11.) The parties agree that, for the first year of Whitworth's confinement at Trousdale, there were designated boxes available in the cafeteria (or "chow hall").[2] (*See* Doc. No. 122, PageID# 2457–58, ¶ 11) But Whitworth states that inmates would go weeks without having access to those boxes in 2016 because the prison was on lock-down or inmates were being fed in the housing units. (*See* Doc. No. 68, PageID# 1162–63, ¶¶ 10, 22; Doc. No. 115, PageID# 2255, ¶ 5.) Whitworth further states that there were no posted instructions as to how inmates could otherwise access medical care in either of the units he was housed in at Trousdale. (Doc. No. 115, PageID# 2256–57, ¶ 27.)

Whitworth states that, with other avenues foreclosed, he made repeated verbal requests for medical attention to nurses who were delivering medicine to other inmates in his housing unit between April and August 2016. (Doc. No. 68, PageID# 1163, ¶ 18.) Whitworth states that the nurses promised to "look into it" and "get back" to him but never followed up on his requests. (*Id.*) Whitworth also maintains that he made numerous requests that officers deposit his grievances regarding requests for medical treatment in the designated chow hall grievance boxes for him, but that the officers claimed they were not allowed to do so and that Whitworth would have to deposit them himself. (*Id.* at PageID# 1162, ¶ 10.)

In August 2016, Whitworth again injured his cervical spine. (*See id.* at PageID# 1163, ¶ 21; Doc. No. 115, PageID# 2255, ¶ 16.) Whitworth attributes the injury to a "lack of preventative

---

[2] The parties dispute whether the depositories in the chow hall were the only ones available at Trousdale before April 2017. (*See* Doc. No. 122, PageID# 2457–58, ¶ 11.) CCI maintains that additional "depositories were located in various common areas throughout Trousdale, includ[ing] but not limited to walkways and the recreational yard." (*Id.* (citing Doc. No. 121, PageID# 2453, ¶ 5).) Whitworth states that "[t]he only grievance and medical depositories were located at the chow hall[,]" (Doc. No. 115, PageID# 2256, ¶ 18), and points to CCS's responses to his first set of interrogatories identifying only the two mailboxes in the chow hall in which inmates could place sick call requests (*id.* at PageID# 2257, ¶ 28).

medical treatment." (Doc. No. 68, PageID# 1163, ¶ 21.) After the injury, Whitworth made "almost daily" requests for medical care to officers and other Trousdale staff. (Doc. No. 115, PageID# 2256, ¶ 19.) Whitworth also states that he submitted sick call requests "when, on rare occasion, he had access to the 'sick call' box." (Doc. No. 68, PageID# 1163, ¶ 22.) Whitworth states that many of his sick call requests went unanswered. He also states that, even after the defendants installed a box for sick call forms in his housing unit in April 2017, a nurse told him that the medical staff did not have keys to open the box and retrieve the submitted forms. (*See id.* at PageID# 1165, ¶¶ 31– 32.) The record contains only five written sick call requests from Whitworth at Trousdale, all of which appear to be dated between March 10, 2017, and May 17, 2017. (Doc. No. 115-1, PageID# 2382–86.)

Whitworth and CCS agree that Whitworth visited the clinic at Trousdale several times between October 2016 and May 2017 seeking treatment for his neck pain and related issues, although they dispute the precise number of visits and the specific providers who saw Whitworth during each visit. (*See* Doc. No. 110, PageID# 2209–13, ¶¶ 10–26.) The record reflects the following appointment history:

A clinic appointment or "sick call" was scheduled for Whitworth on August 26, 2016. (*See* Doc. No. 77-3, PageID# 1247.) CCS asserts that Whitworth failed to appear for that sick call. (Doc. No. 110, PageID# 2209, ¶ 12.) Whitworth maintains that he was never notified of the appointment. (*Id.*)

Registered Nurse (RN) Dana Droun saw Whitworth on November 10, 2016.[3] (Doc. No. 110, PageID# 2209–10, ¶ 11; *see* Doc. Nos. 77-3–77-5, PageID# 1247–49.) The notes from that

---

[3]     CCS and Whitworth dispute whether Nurse Practitioner Stephanie Ruckman and Licensed Practical Nurse (LPN) Sandra Grisham were also present at the November 10, 2016, clinic visit. (*See* Doc. No. 110, PageID# 2209–10, ¶ 13.)

visit reflect that Whitworth complained of "neck pain again," mentioned his "C5-C6 fusion," and told Droun that he felt like he had a pinched nerve. (Doc. No. 77-3.) It appears that Droun prescribed Ibuprofen for four days "per protocol," advised Whitworth "to apply ice [at] intervals," and promised to refer him to a nurse practitioner (NP) regarding his "cervical [spine] issues[.]" (*Id.*) A list of corresponding "physician's orders" shows that RN Droun and NP Stephanie Ruckman signed off on the November 10, 2016 prescription of Ibuprofen.[4] (Doc. No. 77-4, PageID# 1248.) Droun also signed an "institutional health services referral" form dated November 10, 2016, which records that Whitworth came in with neck pain that "radiates to [his] shoulder [and] arm." It also notes the possibility that Whitworth had a pinched nerve, his history of cervical spinal issues, and her recommendation of Ibuprofen and ice. (Doc. No. 77-5.) Droun noted "mild bulging[,]" presumably related to Whitworth's neck pain, and the words "Bone & Joint Clinic Vandy" appear at the top of the form. (*Id.*) CCS maintains that this document initiated a referral to the Vanderbilt Bone and Joint Clinic, but Whitworth claims the document is a referral to an in-house provider at Trousdale. (Doc. No. 110, PageID# 2210, ¶ 15.) There is no record of Whitworth's attending an appointment at Vanderbilt while he was incarcerated at Trousdale.[5]

The next entry in Whitworth's Trousdale medical record is dated December 22, 2016, and appears to be signed by NP Samantha Smith. (Doc. No. 77-3.) The entry reads: "Reviewed Referral from Nursing appropriate treatment may follow up if needed[.]" (*Id.*) Whitworth states that Smith

---

[4]    Underneath Ruckman's and Droun's signatures, LPN Grisham signed an entry that reads "noted @ 0200 11/11/16[.]" (Doc. No. 77-4, PageID# 1248.)

[5]    CCS also claims that Ruckman entered a request for a referral to the Vanderbilt Bone and Joint Clinic into the Trousdale system approximately four months later, on March 13, 2017. (Doc. No. 110, PageID# 2212, ¶ 23.) CCS submitted additional documentation regarding that request. (*See* Doc. No. 77-12.) CCS has not submitted similar documentation regarding the purported referral request on November 10, 2016.

reviewed only his medical file and deemed the recommended Ibuprofen and ice treatment to be appropriate without seeing or examining him. (Doc. No. 110, PageID# 2211, ¶ 16.) CCS maintains that this entry shows that Whitworth "was seen again for a follow-up Problem Oriented Progress visit relating to the previous complaint of neck pain in November, and the referral was renewed and it was noted that he should follow up again if necessary." (Doc. No. 77-1, PageID# 1241, ¶ 14 (citing Doc. No. 77-3); Doc. No. 110, PageID# 2211, ¶ 16.)

On December 28, 2016, Whitworth saw LPN James Evans and again complained of neck pain. (*See* Doc. No. 77-3, PageID# 1247; Doc. No. 110, PageID# 2211–12, ¶ 17.) Evans noted that Whitworth's "neck pain continued," mentioned the prior "fusion," and stated that Whitworth had requested a second mattress. (Doc. No. 77-3.) Evans's notes further indicate that he planned to confer with an NP regarding the mattress request and appropriate medication. (*Id.*) The corresponding physician's orders show that, on December 28, 2016, NP Smith prescribed Whitworth fifteen milligrams of the anti-inflammatory drug Mobic for ninety days. (Doc. No. 77-4.) Evans completed a "healthcare provider communication form" addressed to Whitworth dated December 28, 2016, explaining that "Ms[.] Smith has ordered [m]edication for you called Mobic to help with pain, [b]ut said no on the mattress." (Doc. No. 77-6.) Evans's notes on Whitworth's medical record also reflect Smith's orders: "Confer [with] NP, ant[i-]inflammatory Mobic ordered, no mattress[.]" (Doc. No. 77-3.) CCS maintains, based on this evidence, that NP Smith saw Whitworth for a sick call on December 28, 2016. (Doc. No. 110, PageID# 2211–12, ¶ 17.) Whitworth disputes that Smith saw or examined him on that day. (*Id.*) The parties agree that Whitworth was given a ninety-day supply of fifteen milligram Meloxicam tablets, a generic version of Mobic, on December 28, 2016, and that he again received Meloxicam in January and February 2017. (*Id.* at PageID# 2212, ¶¶ 18–19, 21.)

An entry on Whitworth's medical chart dated February 15, 2017, shows a physician's order placing Whitworth on a CCS provider's schedule for a neck evaluation. (Doc. No. 77-4; Doc. No. 110, PageID# 2212, ¶ 20.)

On March 10, 2017, Whitworth submitted a sick call request for "severe pain in [his] neck radiating down [his] right arm." (Doc. No. 115-1, PageID# 2386.) On March 13, 2017, Whitworth visited the clinic and complained about a bulging disc in his neck and pain in his shoulder and arm. (*See* Doc. No. 77-3; Doc. No. 115-1, PageID# 2430.) Whitworth explains that he was speaking to a nurse in the clinic on March 13, 2017, when NP Ruckman walked in. The nurse asked NP Ruckman to review Whitworth's file; Ruckman did and recommended a referral to Whitworth's original surgeon.[6] (Doc. No. 68, PageID# 1164–65, ¶ 27; Doc. No. 88-2, PageID# 2034.) After that clinic visit, CCS provided Whitworth with an extra mattress to use for thirty days. (Doc. No. 77-10; Doc. No. 110, PageID# 2212, ¶ 22.) NP Ruckman noted that, on March 13, 2017, she placed a referral request in the Trousdale system for Whitworth to see his "previous surgeon[.]" (Doc. No. 77-3; *see* Doc. No. 77-4.) CCS has submitted an "Offsite Services Referral Request" form that appears to request an office visit for Whitworth at "Vanderbilt Bone and Joint" with his "previous surgeon[.]" (Doc. No. 77-12, PageID# 1256.) CCS also submitted an "off-site claims form" and "consult sheet" that reference a requested "outpatient facility" appointment for Whitworth on June 21, 2017 at 7:45 a.m. (*Id.* at PageID# 1257–58.) These documents are not dated, and it is not clear from the documents themselves whether CCS or CCI transmitted these documents to Vanderbilt

---

[6]     CCS asserts that Whitworth saw NP Ruckman on March 17, 2017, based on notes in Whitworth's medical record that are dated March 17, 2017. (Doc. No. 77-1, PageID# 1243, ¶ 22 (citing Doc. Nos. 77-3, 77-11).) Whitworth states that he saw NP Ruckman on March 13, 2017, and visited the clinic again on March 17, 2017, "to see the nurse [and] inquire why he had not heard from anyone regarding his medical condition." (Doc. No. 110, PageID# 2213, ¶ 24.)

or whether an offsite appointment for Whitworth was actually scheduled. It is undisputed that Whitworth did not attend an appointment at Vanderbilt on June 21, 2017.

On March 28, 2017, Whitworth submitted a sick call request that reads: "Constant pain in neck radiating down right shoulder [and] right arm. I'm losing feeling in both hands and feet. NP Ruckman was sup[p]ose[d] to get me an app[ointment] with my Dr. (McNimara). Haven't heard anything. Problem is getting worse[.]" (Doc. No. 115-1, PageID# 2385.) Whitworth submitted two more sick call requests on April 2, 2017, and April 6, 2017. (*Id.* at PageID# 2383–84.) Both requests reference Whitworth's severe neck pain, numbness in his hands and feet, and the fact that NP Ruckman told him she would refer him to his surgeon at Vanderbilt. (*See id.*) On April 7, 2017, LPN Melanie Manzo saw Whitworth for a sick call in response to these requests. (*See* Doc. No. 77-3; Doc. No. 110, PageID# 2213, ¶ 25; Doc. No. 115-1, PageID# 2430.) Manzo noted that Whitworth was experiencing pain in his neck and right side and that he was "waiting on [an] app[ointment] per nursing protocol[.]" (Doc. No. 77-3.) Manzo gave Whitworth 325 milligram doses of Tylenol to take as needed for four days. (*See id.*; Doc. No. 77-4; Doc. No. 110, PageID# 2213, ¶ 26.)

On April 14, 2017, Whitworth filed a grievance regarding the lack of medical attention he had experienced over the past year.[7] (Doc. No. 88-2, PageID# 2033–34.) The grievance details Whitworth's repeated and unsuccessful requests for medical attention, explains the severity of his spinal injury, and again asserts the need to see his spinal surgeon as soon as possible. (*Id.*) CCI responded to the grievance on its merits on May 1, 2017, by stating that Whitworth had been seen

---

[7] It appears that Whitworth signed and dated the grievance on April 14, 2017, and that Sgt. Pierce marked the grievance as received on April 26, 2017 (Doc. No. 88-2, PageID# 2033), one day after Whitworth says boxes for grievances and sick call requests were first installed in his Trousdale housing unit (Doc. No. 122, PageID# 2457–58, ¶ 11). CCI agrees that such boxes were first installed in various Trousdale units between April 20 and 27, 2017. (*Id.*)

and treated by several medical providers who had given him medication and that he should place another sick call for any further discomfort. (*Id.* at PageID# 2035.) Whitworth appealed that response on May 11, 2017. (*Id.* at PageID# 2033.) The Warden agreed with the original response on May 14, 2017, and Whitworth appealed again on May 15, 2017. (*Id.* at PageID# 2032.) On May 22, 2017, the TDOC Deputy Commissioner of Operations affirmed the original response. (*Id.* at PageID# 2031.) It is undisputed that Whitworth exhausted his administrative remedies with respect to this grievance. (*See* Doc. No. 68, PageID# 1162, ¶ 14; Doc. No. 88, PageID# 2015–16, ¶ 4.) Whitworth also states that he submitted four additional grievances regarding his claims in this case before April 14, 2017, all of which went unanswered. (Doc. No. 111, PageID# 2225, ¶ 2; Doc. No. 115-1, PageID# 2255, ¶ 5.) CCI maintains that the April 14, 2017 grievance is the only grievance Whitworth filed at Trousdale involving claims relevant to this action. (Doc. No. 88, PageID# 2015–16, ¶ 4; Doc. No. 111, PageID# 2225, ¶ 2.)

On May 17, 2017, Whitworth submitted another sick call request. (Doc. No. 115-1, PageID# 2382.) It reads: "I have severe neck pain, hands [and] legs going numb, pain radiating to right shoulder and arm. I have made many requests for medical attention. Please help." (*Id.*) The record shows that Whitworth did not receive any further medical attention at Trousdale. (*See* Doc. No. 77-3.) Whitworth was transferred to South Central on May 24, 2017. (Doc. No. 68, PageID# 1165, ¶ 33; *see* Doc. No. 110, PageID# 2207, ¶ 5.)

## B. South Central

CCI provides its own medical services to inmates at South Central and does not contract with CCS at that facility. (Doc. No. 68, PageID# 1165, ¶ 33; Doc. No. 110, PageID# 2207, ¶ 4.) On the day Whitworth arrived at South Central, its medical staff received and reviewed his medical

records from Trousdale.[8] (*See* Doc. No. 83, PageID# 1421.) Whitworth notified the medical staff during his intake appointment on May 24, 2017, that he had injured his spine at Trousdale and had an ongoing need for medical care related to that injury. (*See id.*; Doc. No. 122, PageID# 2460, ¶ 18.) The notes from that intake appointment state that a "referral [is] required." (Doc. No. 83, PageID# 1421; Doc. No. 122, PageID# 2460, ¶ 18.) On May 30, 2017, Whitworth went to sick call complaining of neck pain and numbness in his fingers. (Doc. No. 83, PageID# 1421; Doc. No. 115-1, PageID# 2431; Doc. No. 122, PageID# 2460, ¶ 18.) He told the nurse that he needed surgery, not medication, for his injury, and the nurse noted a plan to "[r]efer [Whitworth] to [a] provider[.]" (Doc. No. 83, PageID# 1421.)

On June 27, 2017, Whitworth saw NP Debra Kelley. (*See id.* at PageID# 1422; Doc. No. 122, PageID# 2460, ¶ 19.) He complained that his neck pain was not getting better and told Kelley that he was experiencing many of the same symptoms that had led to his spinal surgery, including "paresthesia, tingling, pain, [and] ROM [range of motion.]" (Doc. No. 83, PageID# 1422.) He also stated that the "[p]ain [had been] present since Aug[ust] 2016 . . . ." (*Id.*) Kelley ordered an x-ray of Whitworth's cervical spine and wrote in his chart: "Await referral to Dr[.] Soldo for possible offsite [appointment.]" (*Id.*; *see also id.* at PageID# 1423; Doc. No. 68, PageID# 1166, ¶ 34; Doc. No. 122, PageID# 2460, ¶19.) Whitworth states that he had an on-site x-ray on

---

[8]      CCI submitted Whitworth's South Central medical records under seal. (Doc. No. 83.) However, both Whitworth and CCI include and discuss these records elsewhere in their publicly filed documents. (*See* Doc. No. 115-1, PageID# 2324–80; Doc. No. 122, PageID# 2460–62, ¶¶ 18–23.) Consequently, and because Whitworth has not objected to public citation of these documents, the court will treat the South Central medical records as though they are public.

June 29, 2017.[9] (Doc. No. 68, PageID# 1166, ¶ 34; Doc. No. 115, PageID# 2257, ¶ 31; Doc. No. 115-1, PageID# 2431.)

On October 2, 2017, Whitworth saw an LPN and complained of "continuous issues" relating to his spine, including "radiating pain [and] numbness." (Doc. No. 83, PageID# 1425.) Whitworth told the nurse that the pain interfered with his ability to interact with visitors and that it kept him from being able to play cards with his children. (*Id.*) He again mentioned his surgery fusing his C5 and C6 vertebrae and again stated that he was experiencing the same symptoms he had experienced before that surgery. (*Id.* at PageID# 1426.) Whitworth also complained of anxiety and an inability to sleep. (*Id.*) The LPN referred Whitworth to a mental health provider for his anxiety and stress due to insomnia and wrote "[r]efer to provider – NP." (*Id.* at PageID# 1425.)

On November 6, 2017, Whitworth saw Dr. Joseph Soldo, an onsite medical provider at South Central. (*See* Doc. No. 83, PageID# 1427–28; Doc. No. 115-1, PageID# 2431; Doc. No. 122, PageID# 2460–61, ¶ 19.) Dr. Soldo ordered twice-weekly physical therapy for six weeks and referred Whitworth to Dr. McNamara at Vanderbilt Bone and Joint Center for an orthopedic consult. (*See* Doc. No. 83, PageID# 1427–28; Doc. No. 115-1, PageID# 2431; Doc. No. 122, PageID# 2460–61, ¶ 19.)

On November 20, 2017, Whitworth saw NP Pearson. (*See* Doc. No. 83, PageID# 1429–30; Doc. No. 115-1, PageID# 2431; Doc. No. 122, PageID# 2460–61, ¶ 19.) Whitworth told NP Pearson about his surgery and stated that he was experiencing neck pain, numbness, and tingling in his hands. (Doc. No. 83, PageID# 1429.) NP Pearson noted that Whitworth reported tenderness upon palpitation of his neck, that he exhibited a decreased range of motion (*id.*), and that he had

---

[9]     CCI states that the x-ray took place on June 27, 2017. (Doc. No. 122, PageID# 2460, ¶ 19.) This difference is not material.

an offsite visit with an orthopedics provider scheduled (*id.* at PageID# 1430). Pearson ordered blood pressure checks for Whitworth three times a week to be reviewed by an on-site provider and permission for Whitworth to sleep on a bottom bunk for three months. (*See id.*)

Whitworth began physical therapy on November 28, 2017. (*See* Doc. No. 83, PageID# 1455–62; Doc. No. 115-1, PageID# 2431.) The records from his first physical therapy appointment show a primary diagnosis of cervical disc disorder with radiculopathy and note that Whitworth had reported awakening about one year ago with neck spasms and reported "insidious onset and progressive increase in neck and [right upper extremity] pain." (Doc. No. 83, PageID# 1456.) A cervical compression test was positive, suggesting Whitworth had experienced nerve root irritation or inflammation. (*Id.* at PageID# 1460.) Whitworth attended physical therapy sessions approximately twice a week for six weeks. (*See id.* at PageID# 1455–89; Doc. No. 122, PageID# 2462, ¶ 23.)

On December 1, 2017, Whitworth was transported to the Mid Tennessee Bone & Joint Clinic, where he saw orthopedic specialist Dr. C. Douglas Wilburn. (*See* Doc. No. 83, PageID# 1431, 1435–39; Doc. No. 115-1, PageID# 2431; Doc. No. 122, PageID# 2461, ¶ 20.) Dr. Wilburn x-rayed Whitworth's cervical spine and noted a "[d]egenerative disc at C6-7 with some anterior spurring and disc space narrowing." (Doc. No. 83, PageID# 1435.) Dr. Wilburn also ordered an MRI of Whitworth's cervical spine "to evaluate his C6-7 disc space." (*Id.* at PageID# 1438.) Dr. Wilburn scheduled an MRI appointment for Whitworth at Maury Regional Hospital on December 11, 2017 (*id.* at PageID# 1440), and a follow-up appointment with Whitworth on December 15, 2017 (Doc. No. 115-1, PageID# 2356). Under CCI security protocols, both appointments were re-scheduled. (Doc. No. 122, PageID# 2461, ¶ 20.)

On December 21, 2017, Whitworth went to nurse sick call and requested renewal of his pain medications. (*See* Doc. No. 83, PageID# 1432.) LPN Smith referred Whitworth to a provider. (*See id.*)

On January 9, 2018, Whitworth was transported to Maury Regional Hospital for a cervical spine MRI. (*See* Doc. No. 83, PageID# 1432–33.) In the C6-C7 region, the MRI showed "[d]isc height loss and broad-based posterior disc bulge with uncovertebral joint osteophytes, right greater than left. There is severe right and moderate left neuroforaminal stenosis." (*Id.* at PageID# 1441.) On January 26, 2018, Dr. Soldo reviewed the MRI results and wrote an order for an orthopedic follow-up appointment with Dr. Wilburn. (*See id.* at PageID# 1432–33.)

On February 15, 2018, Whitworth saw LPN Smith again, complaining of constant pain that kept him up at night and asking for pain medication to help him sleep and to see the doctor. (*See* Doc. No. 115-1, PageID# 2337.)

On February 21, 2018, Whitworth was again transported to the Mid-Tennessee Bone & Joint Clinic for an appointment with Dr. Wilburn. (*See* Doc. No. 83, PageID# 1433, 1445–50; Doc. No. 115-1, PageID# 2432.) Dr. Wilburn noted that the MRI showed "[s]ignificant degenerative changes at the C6-C7 level" and a "[d]egenerative C6 disc bulge that is on the right side and causes foraminal narrowing." (Doc. No. 83, PageID# 1446.) His assessment of Whitworth's medical condition included "[o]steoarthritis of [the] spine, with radiculopathy, [in the] cervical region[.]" (*Id.* at PageID# 1449.) After reviewing the MRI results with Whitworth, Dr. Wilburn recommended a steroid injection to the right C6-C7 region. (*Id.* at PageID# 1449.) Dr. Wilburn also encouraged Whitworth to exercise and stretch several times a day and to continue to take Ibuprofen and apply ice or heat as needed. (*Id.*) On or about March 2, 2018, Whitworth received the prescribed steroid injection from Dr. Wilburn. (*See* Doc. No. 83, PageID# 1434, 1443–44.) It

appears that Whitworth received another steroid injection at the Mid-Tennessee Bone & Joint Clinic on March 23, 2018. (*See* Doc. No. 115-1, PageID# 2433.)

In an exhibit to his declaration in opposition to summary judgment, Whitworth describes further interactions with South Central medical staff regarding his requests for pain medication and issues with high blood pressure. (*Id.* at PageID# 2432–33) It appears that Whitworth saw several nurses and one on-site physician between March 9, 2018, and May 14, 2018, inquiring about when his pain medication would be renewed and discussing his elevated blood pressure, which the nurses and doctor attributed to his ongoing pain. (*Id..*) On May 17, 2018, Whitworth began to receive pain medication again. (*Id.* at PageID# 2433.)

It is undisputed that Whitworth did not file a grievance related to his claims in this action while incarcerated at South Central. (Doc. No. 111, PageID# 2225, ¶ 3.)

## II.     Procedural History

Whitworth filed this action pro se on August 7, 2017, while incarcerated at South Central. (Doc. No. 1.) On August 22, 2017, the Court granted Whitworth's application to proceed *in forma pauperis* and reviewed his original complaint under 28 U.S.C. § 1915A, finding that Whitworth had stated colorable claims against CCI and CCS under 42 U.S.C. § 1983 for violations of his Eighth Amendment right to adequate medical care while incarcerated, stemming from the defendants' policies and practices. (Doc. No. 5.)

On September 18, 2017, Whitworth moved for a temporary restraining order and a preliminary injunction. (Doc. No. 8.) The Magistrate Judge issued a report and recommendation on August 15, 2018, recommending that the Court deny Whitworth's motion for a temporary restraining order and preliminary injunction. (Doc. No. 94.) The report and recommendation explained that there was insufficient evidence in the record to satisfy the stringent prerequisites for

granting the kind of preliminary injunctive relief Whitworth sought. (*Id.* at PageID# 2090–95.) The Magistrate Judge also noted that the proof required to justify a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment. (*Id.* at PageID# 2087 (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).) Neither Whitworth nor the defendants objected to the report and recommendation. The court therefore denied Whitworth's motion for a temporary restraining order and preliminary injunction. (Doc. No. 101.)

Whitworth moved for and was granted leave to amend his complaint. (Doc. Nos. 38, 67.) The amended complaint makes two claims against CCI and CCS under 42 U.S.C. § 1983 for violation of Whitworth's Eighth Amendment right to adequate medical care while incarcerated at Trousdale and South Central. Whitworth bases his Eighth Amendment claim in Count One on the defendants' customs or policies of ignoring or substantially delaying requests for medical treatment. (Doc. No. 68, PageID# 1166–69, ¶¶ 37–54.) His Eighth Amendment claim in Count Two centers on the defendants' customs or policies of failing to provide adequate training to their employees regarding provision of medical care. (*Id.* at PageID# 1169, ¶¶ 55–57.) Whitworth alleges that these customs and policies caused him unnecessary and wanton infliction of pain. (*Id.* at PageID# 1168, ¶ 45.)

Both defendants moved for summary judgment on August 13, 2018. (Doc. Nos. 77, 81.) In its motion, CCS argues that Whitworth failed to comply with pre-suit notice requirements under the Tennessee Health Care Liability Act, that he has not shown that CCS acted with deliberate indifference, and that he cannot show that a CCS policy or custom caused him to suffer a constitutional injury. (Doc. No. 78, PageID# 1333–43.) CCI makes the same arguments and also asserts that Whitworth failed to exhaust administrative remedies with respect to most of his claims.

(Doc. No. 84, PageID# 1496–1513.) Specifically, CCI concedes that Whitworth exhausted his administrative remedies regarding his claim that CCI had a policy or custom of ignoring or tolerating Eighth Amendment violations at Trousdale but argues that he failed to administratively exhaust his failure-to-train claim or his claim that CCI had a policy or custom of ignoring or tolerating Eighth Amendment violations at South Central. (*Id.* at PageID# 1498.) Whitworth responded in opposition to both motions, arguing that his claims arise under federal law, that he exhausted administrative remedies regarding all of his claims, and that the record contains sufficient evidence for a reasonable jury to find that CCI and CCS violated his Eighth Amendment rights by way of their respective customs and policies. (*See* Doc. Nos. 112–14.)

## III.     Legal Standard

Federal Rule of Civil Procedure 56 requires courts to grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Moldowan*, 578 F.3d at 374. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson*, 477 U.S. at 249). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. Courts will only deny a motion for summary judgment if, taking the record as a whole, there is evidence on which a jury could reasonably find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

Because Whitworth is proceeding without counsel, the court is mindful that his filings must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

IV.     **Analysis**

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). Because CCI and CCS perform the traditional state functions of operating a prison and providing medical services to persons in state custody, both act under color of state law and are subject to being sued under Section 1983. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)).

Whitworth alleges that CCI and CCS, in accordance with their respective policies and customs, deprived him of his right to adequate medical care. (Doc. No. 68, PageID# 1166–69.) Whitworth does not assert that any individual CCI or CCS employee is liable for violating his rights. Rather, he relies on familiar Supreme Court precedent—first articulated in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and *City of Canton v. Harris*, 489 U.S. 378 (1989)—holding that a government body or private entity performing a government function "can be found liable under § 1983 . . . where the [entity] *itself* causes the constitutional violation at issue" through execution of its own policies or customs. *Canton*, 489 U.S. at 385 (emphasis in original) (citing *Monell*, 436 U.S. at 694–95). In such cases, the overarching question is "whether there is a direct causal link between [the entity's] policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.

## A. State Law Notice Requirements Do Not Apply to Whitworth's Federal Claims

Whitworth does not bring any state law claims in this action. (*See* Doc. No. 68; Doc. No. 110, PageID# 2208–09, ¶¶ 8–9.) His amended complaint only includes claims under Section 1983. (Doc. No. 68.) Puzzlingly, however, both CCI and CCS argue that, because Whitworth's Section 1983 claims involve the adequacy of medical treatment, this court should require him to comply with provisions of the Tennessee Health Care Liability Act (THCLA), Tenn. Code Ann. § 29-26-121(a)–(b), that mandate notice to healthcare providers before suit can be filed against them. (Doc. No. 78, PageID# 1333–34; Doc. No. 84, PageID# 1511–13.) Neither CCI nor CCS cites any authority for the proposition that the THCLA applies to Whitworth's federal claims, and the Court is aware of no basis for that finding. To the contrary, courts in this district have held that the THCLA "is wholly inapplicable" to Section 1983 claims for deliberate indifference to serious medical needs under the Eighth Amendment. *Pruitt v. McConnell*, No. 3:13-01003, 2015 WL

632142, at *1 (M.D. Tenn. Feb. 13, 2015). The defendants' argument for summary judgment on this ground fails.

B.   **CCI Has Not Shown that Whitworth Failed to Exhaust Any Aspect of His Municipal Policy Claims**

The Prison Litigation Reform Act (PLRA) requires plaintiffs to exhaust all available administrative remedies, including prison grievance procedures, before filing an action addressing the conditions of their confinement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 577 (6th Cir. 2014), *aff'd*, 136 S. Ct. 1843 (2016). The purpose of this exhaustion requirement is to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 525; *see Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) ("The point of the PLRA exhaustion requirement is to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court.").

Administrative exhaustion is an affirmative defense for which defendants bear the burden of proof. *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)). To properly exhaust a claim, a prisoner must "tak[e] advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey*, 603 F.3d at 324 (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). Exhaustion in this context therefore requires compliance with "'applicable procedural rules' . . . that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). Accordingly, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion[,]" and

"[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim . . . ." *Jones*, 549 U.S. at 218. Grievances need not "'allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory.'" *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006) (quoting *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006), *abrogated on other grounds by Jones*, 549 U.S. 199). Instead, "'it is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.'" *Id.* (alteration in original).

CCI attempts to divide Whitworth's Eighth Amendment claims by legal theory and prison for purposes of its exhaustion argument.[10] Specifically, although CCI concedes that "Whitworth exhausted his administrative remedies on th[e] grievance" he filed at Trousdale regarding undue delay in his medical care, it argues that Whitworth has not exhausted his claim that CCI's failure to train its Trousdale employees led to a violation of his constitutional rights. (Doc. No. 84, PageID# 1498.) CCI also asserts that, because Whitworth did not file a second grievance after his transfer to South Central, he failed to exhaust either of his claims with regard to that facility. (*Id.*) In response, Whitworth maintains that he properly exhausted all of his claims through the grievance he filed and exhausted at Trousdale and points to the CCI grievance procedure policy in place at both facilities, which states that "inmates shall not be permitted to submit more than one grievance arising out of the same or similar incident." (Doc. No. 114, PageID# 2248 (quoting Doc. No. 88-1, PageID# 2023, ¶ I.1).) CCI replies that Whitworth's exhausted grievance did not mention employee training and could not have included his subsequent medical treatment at South

---

[10]    CCS has not raised administrative exhaustion as an affirmative defense. Accordingly, this section only addresses Whitworth's claims against CCI.

Central. (*See* Doc. No. 120, PageID# 2442–46.) It also argues that the policy Whitworth cites only prohibits duplicative grievances based on the same incident and does not apply here. (*Id.* at PageID# 2443.)

CCI's arguments misconstrue Whitworth's municipal liability claims and misunderstand the law governing administrative exhaustion under the PLRA. Whitworth's claim against CCI is that, while in CCI's care at Trousdale and South Central, he experienced a "lack of medical care [that] was attributable to a policy or custom rather than an isolated incident of indifference" and that rose to the level of an Eighth Amendment violation. (Doc. No. 5, PageID# 23–24.) A plaintiff may prove the existence of a policy or custom that is actionable under Section 1983 in four ways:

> The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

Here, Whitworth pursues his Eighth Amendment claims under two of these theories: first, that CCI and CCS have unwritten policies or customs of inaction in response to violations of incarcerated persons' Eighth Amendment rights (Count One) and, second, that CCI and CCS have unwritten policies or customs of failing to train their employees adequately with respect to providing medical care (Count Two). (Doc. No. 68, PageID# 1166–69.) Because the PLRA does not require a grievance "'to allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory[,]'" *Bell*, 450 F.3d at 654 (quoting *Spencer*, 449 F.3d at 725), CCI's argument that Whitworth did not exhaust his Eighth Amendment failure-to-train theory separately from his Eighth Amendment inaction theory is unavailing. Whitworth was "not required to exhaust [his] failure to train claims separately from the underlying incidents giving rise to [his] constitutional claims." *Ramos v. Monteiro*, No. CV 06-0832, 2008 WL 4184644, at *13 (C.D. Cal.

Sept. 5, 2008); *see Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004) ("[A] grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit."); *Czapiewski v. Bartow*, No. 07-cv-549, 2008 WL 2622862, at *2 (W.D. Wis. July 1, 2008) (finding that a prisoner's grievance "identified the core issue" from which "defendants could have discovered any possible wrongdoing" related to their actions, including a "failure to train").

CCI also argues that Whitworth's grievance only exhausted his claims as they relate to his incarceration at Trousdale and does not encompass harm he experienced at South Central. As pleaded in his Amended Complaint, Whitworth's Eighth Amendment claims against CCI include his time at both institutions. (Doc. No. 68.) It is undisputed that Whitworth did not file any grievances related to this action after his transfer to South Central. (Doc. No. 111, PageID# 2225–26, ¶ 3.) The court must therefore determine whether Whitworth's April 14, 2017 grievance gave CCI a fair opportunity to address its relevant customs and policies at South Central as well as at Trousdale.

Whitworth's April 14, 2017 grievance states that he "ha[d] been requesting medical attention for a very serious spinal issue since [he] was at Northwest Correctional Complex" before being transferred to Trousdale, a period of more than a year. (Doc. No. 88-2, PageID# 2034.) It notified CCI that he previously "had a cervical fusion surgery due to a ruptured disk" and had "another disc issue that need[ed] immediate attention." (*Id.*) The grievance stated that Whitworth had repeatedly requested medical help since he arrived at Trousdale in April 2016, but that many of his sick call requests went unanswered, and the RNs or LPNs in the clinic who promised to refer him to an NP for further treatment never did so. (*See id.*) Whitworth states that he caught NP Ruckman's attention by chance during a clinic visit with an RN on March 13, 2017, and that

Ruckman promised to refer him to his previous spinal surgeon. (*Id.*) But, "[o]nce again another month ha[d] passed and [Whitworth had not] received any medical help." (*Id.*) The grievance concluded by describing the severity of Whitworth's condition: "neck pain with pain radiating into [his] right shoulder and down [his] right arm" that "never goes away" and "losing feeling in both hands and below the knees in both legs." (*Id.*) CCI responded to Whitworth's grievance on the merits, finding that "Whitworth ha[d] been seen by several medical professionals for care and was treated." (*Id.* at PageID# 2035.) Both CCI and the TDOC affirmed this response in the following appeals. (*Id.* at PageID# 2031–32.)

Drawing all inferences in Whitworth's favor, as it must, the court finds that this grievance put CCI on notice that its employees and agents at Trousdale were repeatedly ignoring or inadequately responding to Whitworth's requests for medical help to address a serious medical condition. CCI therefore had a fair opportunity to consider these problems before judicial intervention, including by investigating how it was training its employees and agents and how those employees and agents were implementing CCI's stated policies regarding access to medical care. *See Porter*, 534 U.S. at 524–25; *Czapiewski*, 2008 WL 2622862, at *2. Whether CCI had notice that these reported problems might extend to facilities other than Trousdale is a closer question, one that the court finds involves genuine questions of material fact.

CCI maintains that "Whitworth's grievance[ ] regarding medical treatment at Trousdale do[es] not begin to exhaust his claims regarding medical treatment at South Central," arguing that his time at South Central involved "separate incident[s]" and "different medical treatment provided at a different facility by different medical providers." (Doc. No. 120, PageID# 2443.) This argument again misconstrues Whitworth's municipal liability claim, which does not rest on "isolated incident[s] of indifference" by individual actors but on execution of CCI's customs and

policies. (Doc. No. 5, PageID# 24.) It also ignores the fact that CCI runs both Trousdale and South Central pursuant to what appear to be the same relevant written policies (*compare* Doc. No. 85, PageID# 1688, ¶ 9, *with* Doc. No. 86, PageID# 1850, ¶ 9) and that all of the onsite medical providers at Trousdale and South Central are either employees or subcontractors of CCI.

Whitworth also cites record evidence showing that CCI policy 501.01 prohibits inmates from "submit[ting] more than one grievance arising out of the same or similar incident." (Doc. No. 88-1, PageID# 2023; Doc. No. 90-1, PageID# 2060.) Reasonable minds could find that this policy indeed prohibited Whitworth from submitting a second grievance regarding continued lack of medical care for the same injury; this is particularly true because the grievance committee's response to Whitworth's first appeal of his April 14, 2017 grievance includes a cryptic note stating that an "inappropriate hearing [was] held per policy 501.01[.]" (Doc. No. 88-2, PageID# 2032.) There is therefore a genuine issue of material fact regarding whether CCI had a fair opportunity to correct its relevant customs and policies regarding medical care at South Central prior to Whitworth's filing of this suit. *See Surles,* 678 F.3d at 457–58 (holding that genuine disputes of material fact regarding administrative exhaustion precluded summary judgment on exhaustion grounds); *Dodson v. CoreCivic*, No. 3:17-cv-00048, 2018 WL 4800836, at *6 (M.D. Tenn. Oct. 3, 2018) (observing that "a triable issue of fact as to exhaustion" makes "a grant of summary judgment inappropriate" (citation omitted)).

The cases CCI cites in support of its argument that Whitworth was required to file a separate grievance at South Central are inapposite because all address exhaustion in the context of claims against individual defendants. (Doc. No. 120, PageID# 2442–43.) None involves exhaustion of a municipal liability claim addressing a custom or policy—much less a municipal liability claim brought against a private contractor that ran the facilities on both ends of a transfer.

And none appears to address the grievance procedures at issue here, which were drafted by the TDOC and adopted by CCI.

For example, CCI cites *Cromer v. Carberry*, No. 2:08-CV-203, 2010 WL 3431654, at *2 (W.D. Mich. Aug. 30, 2010), for the proposition that courts in this circuit "have heard and rejected" Whitworth's argument that "TDOC Policy 501.01 prevents inmates from filing multiple grievances 'arising out of the same or similar incident.'" (Doc. No. 120, PageID# 2442 (quoting Doc. No. 111, PageID# 2225, ¶ 3).) But *Cromer* did not address that policy, much less determine how it applied to a municipal claim. Rather, in *Cromer*, an incarcerated person in Michigan alleged that an individual defendant violated his constitutional right to practice his religion by calling him a non-preferred version of his name during a religious service on January 19, 2007. 2010 WL 3431654, at *1. Cromer only filed a grievance regarding an incident with the same defendant that occurred the day before, on January 18, 2007. *Id.* The court found that his failure to separately grieve the January 19th conduct, which "occurred on a different day, under different circumstances, deprived prison officials of the opportunity to review and correct that conduct prior to the Court's intervention." *Id.* at *2. Unlike the claims in *Cromer*, Whitworth's custom and policy claims do not turn on isolated incidents of indifference by individual defendants. CCI's remaining cases similarly involve failures by persons incarcerated in Michigan and federal facilities to grieve specific incidents that were central to their claims against individual defendants; they do not support CCI's argument that Whitworth failed to exhaust his custom or policy claim in this action. *See Cummings v. Walton*, No. 1:14-cv-932, 2015 WL 8488427, at *4 (W.D. Mich. Nov. 20, 2015) (report and recommendation finding that none of the grievances a plaintiff filed at two different Michigan correctional facilities involved the incidents underlying his claims against individual defendants); *Christian v. Mich. Dep't of Corr. –Health Servs.*, No. 12-cv-12936, 2013 WL

5348832, at *4 (E.D. Mich. Sept. 24, 2013) (finding that plaintiff failed to exhaust his claims against a particular individual defendant because the applicable Michigan grievance procedures do not include discussions with the Office of Legislative Corrections Ombudsman); *Diing v. Graeser*, No. 1:10-cv-1191, 2012 WL 851132, at *6 (W.D. Mich. Jan. 27, 2012) (report and recommendation finding that a Michigan plaintiff's grievances directed at a "Dr. Noronha" were not relevant to his constitutional claim against "Dr. Graeser" in his individual capacity); *Antonelli v. Crow*, Civ No. 08-261, 2012 WL 4215024, at *13 (E.D. Ky. Sept. 19, 2012) (finding that a person incarcerated in a federal facility in Kentucky failed to properly grieve his claim that individual prison staff members removed him from an Alcoholics Anonymous group in retaliation for filing grievances).

CCI therefore has not shown that it is entitled to summary judgment with respect to either Count on exhaustion grounds.

### C. There are Genuine Issues of Material Fact Regarding Count One, But the Defendants Are Entitled to Summary Judgment with Respect to Count Two

Courts in this circuit engage in a two-pronged inquiry when considering municipal liability claims under Section 1983. *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (quoting *Cash v. Hamilton Cty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)); *Doe v. Claiborne Cty.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining that "[a] municipal liability claim . . . must be examined by applying a two-pronged inquiry"). "We first ask whether the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law." *Powers*, 501 F.3d at 607 (first citing *Cash*, 388 F.3d at 542; and then citing *Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003)). Second, we ask whether defendants "are responsible for that

deprivation."[11] *Cash*, 388 F.3d at 542 (citing *Doe*, 103 F.3d at 507); *cf. Powers*, 501 F.3d at 607 (asking "whether the alleged deprivation was caused by the defendants . . .").

### 1.     Whitworth Has Asserted A Federally Protected Right

Under the first prong, courts must consider whether the asserted "rights are federally protected such that, if proven, § 1983 will provide relief for their infringement." *Powers*, 501 F.3d at 607; *see also Cash*, 388 F.3d at 542. Whitworth alleges that CCI and CCS deprived him of medical care for a serious injury while he was incarcerated. (Doc. No. 68, PageID# 1166–69.) It is beyond question that the Eighth Amendment provides people who are incarcerated with a constitutional right to receive adequate medical care while in custody. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle*, 429 U.S. at 103–04; *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). In the Supreme Court's words,

> elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the [Eighth] Amendment.

*Estelle*, 429 U.S. at 103 (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). Because there is no dispute that Whitworth has asserted the deprivation of a federal right, the court next considers whether the defendants are responsible for that deprivation. *Cash*, 388 F.3d at 542.[12]

---

[11]     Here, Whitworth's municipal liability claims under the Eighth Amendment require, among other things, establishing municipal deliberate indifference and a direct causal connection between a municipal custom or policy and the asserted injury. *See Thomas*, 398 F.3d at 429 (setting forth standard for inaction theory of municipal liability); *Connick v. Thompson*, 563 U.S. 51, 61–63 (2011) (articulating standard for failure-to-train theory of municipal liability).

[12]     Under *Powers* and *Cash*, plaintiffs need only assert a violation of a constitutional right to satisfy the first prong of the municipal liability inquiry. *Powers*, 501 F.3d at 607–08; *Cash*, 388 F.3d at 542; *but see Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (requiring plaintiff with municipal liability claim to prove "(1) that a constitutional violation occurred; and (2) that the County 'is responsible for that violation'" (quoting *Doe*, 103

### 2. There Are Genuine Issues of Material Fact Regarding Whether the Defendants Are Responsible for Violations of Whitworth's Eighth Amendment Rights Under an Inaction Theory of Municipal Liability

Under the second prong of the municipal liability inquiry, plaintiffs asserting Section 1983 claims based on an entity's "custom or policy must 'identify the policy, connect the policy to the [municipal entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997) (*Bryan Cty.*) (emphasis in original). The key inquiry thus becomes whether, viewing the alleged policies and customs in the light most favorable to Whitworth, there is "sufficient evidence for reasonable minds to find 'a direct causal link' between [the defendants' customs or] polic[ies] and the alleged denial of [Whitworth's] right to adequate medical care." *Ford*, 535 F.3d at 497 (quoting *Bryan Cty.*, 520 U.S. at 404).

Whitworth relies on two legal theories to identify defendants' illegal customs or policies, alleging that CCI and CCS both have an unwritten custom or policy of inaction in response to violations of incarcerated persons' Eighth Amendment rights (Count One) and an unwritten custom or policy of failing to train their employees adequately with respect to providing medical care (Count Two). (Doc. No. 68, PageID# 1166–1169). *See Thomas*, 398 F.3d at 429. The Sixth

---

F.3d at 505–06)). Whitworth has certainly asserted violations of his Eighth Amendment rights here. Even if Whitworth were required to prove a constitutional violation to satisfy the first prong of this analysis, the court finds that Whitworth has identified genuine issues of material fact regarding whether his Eighth Amendment rights were violated, as explained further herein.

Circuit applies specific inquiries for municipal liability claims based on each theory to determine whether plaintiffs have identified a custom or policy, connected the policy to the defendant municipal entity, and shown that the custom or policy was the moving force behind the alleged injury as required.

### a.      Count One: Inaction Theory

To prevail under an "'inaction theory,' where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched[,]" the plaintiff alleging municipal liability must show:

> (1) the existence of a clear and persistent pattern of illegal activity;

> (2) notice or constructive notice on the part of the defendant;

> (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

> (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Thomas*, 398 F.3d at 429 (alterations omitted) (quoting *Doe*, 103 F.3d at 508); *see Milligan v. United States*, 644 F. Supp. 2d 1020, 1040 n.13 (M.D. Tenn. 2009) (citing *Thomas*, 398 F.3d at 429). The court finds that there are genuine issues of material fact with respect to each of these four elements.

### i.      Existence of a clear and persistent pattern of illegal activity

The "illegal activity" at issue here is activity that violates the Eighth Amendment's prohibition on deliberate indifference to the serious medical needs of an incarcerated person. *See Estelle*, 429 U.S. at 104–05. "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). In *Blackmore*, the Sixth Circuit recognized that "the seriousness of

a prisoner's medical needs 'may *also* be decided by the *effect* of delay in treatment.'" 390 F.3d at 897 (emphasis in original) (quoting *Hill v Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)). In *Westlake v. Lucas*, for example, the Sixth Circuit held that a plaintiff states a cause of action for deliberate indifference to a serious medical need where he or she "alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." 537 F.2d 857, 860 (6th Cir. 1976).

"Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (alteration omitted) (quoting *Westlake*, 537 F.2d at 860 n.5). Nevertheless, it is well established that "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing delay creates [a] constitutional infirmity." *Darrah*, 865 F.3d at 372 (alterations in original) (quoting *Blackmore*, 390 F.3d at 899); *see also Estelle*, 429 U.S. at 103 (recognizing that "denial of medical care may result in pain and suffering[,] which no one suggests would serve any penological purpose"). The Sixth Circuit has also held that a "decision to provide an 'easier and less efficacious treatment' may suffice to establish deliberate indifference." *Darrah*, 865 F.3d at 372 (quoting *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 552 (6th Cir. 2014)).

Whitworth relies on at least three sources of record evidence in support of his argument that there is a clear and persistent pattern of Eighth Amendment violations here. First, Whitworth has submitted a damning report from the TDOC regarding its audit of two CCI facilities, Trousdale

and Whiteville.[13] (Doc. No. 115-1, PageID# 2395–2429.) The audit report found, in no uncertain terms, that "[a]fter nearly two years in operation, Trousdale Turner Correctional Center still did not comply with some of the Department of Correction's policies, facility standards, and contract requirements." (*Id.* at PageID# 2422.) Among other deficiencies, TDOC auditors noted that "unimpeded access to sick call and grievance forms[] appeared to be an issue at both Trousdale [ ] and Whiteville." (*Id.*) Other "[i]ssues of noncompliance" with TDOC policies, standards, and contract requirements that auditors "identified during [their] tour at Trousdale included" the fact that "[o]ne housing pod did not have grievance forms in the unit, and two pods did not have sick call request forms." (*Id.*) Auditors also noted that "[o]nly one pod out of four had instructions for obtaining medical care posted in the pod" (*id.*), which lends support to Whitworth's testimony that the required instructions were not posted in either of the units he was housed in at Trousdale (Doc. No. 115, PageID# 2256–57, ¶ 27). Whitworth's undisputed evidence that sick call boxes were not available in Trousdale housing units for at least a year of his incarceration further bolsters the report's findings that access to medical care at Trousdale was impeded.

Whitworth also points to his medical records from both facilities spanning more than two years, as well as his own sworn testimony. The undisputed record evidence shows, among other things, that Whitworth previously underwent spinal surgery to fuse his C5 and C6 vertebrae, that the records from this surgery and subsequent orthopedic treatment were in his institutional medical file at both Trousdale and South Central, and that those records show a history of ongoing diagnosed spinal problems. The defendants do not dispute that Whitworth suffered an injury to his cervical spine in August 2016 while in custody at Trousdale. Nurses at both facilities made notes

---

[13]    The period of the audit, which TDOC conducted from July 2014 to August 2017 (Doc. No. 115-1, PageID# 2406), overlapped with Whitworth's incarceration in Trousdale and South Central.

regarding a bulging disc in Whitworth's neck while he complained of severe, radiating pain and numbness. There is further record evidence that Whitworth's pain prevented him from sleeping, resulting in anxiety and stress for which medical staff at South Central eventually referred him to a mental health provider. And there is record evidence that medical staff at South Central attributed Whitworth's issues with high blood pressure to his pain.

Through the lens of these facts in particular, the record, viewed in the light most favorable to Whitworth, reveals a clear and persistent pattern of significant delay in response to Whitworth's requests for medical care at both facilities. For example, despite the fact that Whitworth notified CCI and CCS Trousdale health personnel of his prior medical history upon his arrival on April 28, 2016, and despite his repeated verbal requests regarding his need for medical care related to serious spinal problems, 196 days passed before an RN first saw Whitworth in the Trousdale clinic.[14] That RN promised to refer Whitworth to an NP. Another 123 days passed before Whitworth's first undisputed visit with an NP,[15] who finally granted Whitworth's request for an extra mattress to help with his spinal pain and related issues and who told Whitworth that she was going to refer him to an offsite specialist. That offsite referral appointment did not take place.

---

[14]     There is a genuine dispute of material fact as to whether Whitworth missed an earlier clinic appointment on August 26, 2016, but even if he had seen an RN on that date, it would have been 120 days after his arrival at Trousdale. Whitworth also mentioned in his amended complaint that, in September 2016, he was taken to the clinic three hours after requesting an emergency sick call and that, after several more hours of sitting on a steel bench waiting to be seen by clinic staff, he was in excruciating pain and asked to be returned to his housing pod to lie down. (Doc. No. 68, PageID# 1163–64, ¶ 23.)

[15]     There is a genuine dispute of material fact regarding whether NP Ruckman was present at the November 2016 appointment with Whitworth or simply signed off on RN Droun's recommendation of Ibuprofen, and whether NP Smith saw Whitworth in December 2016 or simply reviewed his medical records and determined that no further treatment was warranted.

As soon as Whitworth arrived at South Central, Whitworth notified CCI medical staff that he had injured his spine while at Trousdale and that he had an ongoing need for medical care related to that injury and his prior medical history of cervical spinal issues. Despite noting in his medical record that a referral was required, 34 days passed before an NP saw Whitworth, ordered an x-ray, and referred him to an onsite doctor at South Central. Another 132 days passed before that onsite doctor saw Whitworth, at which point the doctor determined that the appropriate course of treatment for Whitworth's injury and pain involved six weeks of twice weekly physical therapy and a referral to an offsite orthopedic specialist. The physical therapy began more than six months after Whitworth arrived at South Central and more than a year and a half after he first entered the defendants' care. Before that, the only forms of treatment Whitworth received related to his spinal pain while in the defendants' care were occasional access to pain killers and ice and, eventually, an extra mattress and temporary bottom bunk pass. At one point, Whitworth waited 147 days for medical staff at South Central to renew his pain medications, despite his repeated requests.

When Whitworth finally saw an appropriate medical provider, his claims regarding his injury and pain were confirmed. The defendants do not dispute that an offsite orthopedist eventually diagnosed Whitworth with significant degenerative changes to his cervical spine and a degenerative disc bulge and prescribed a course of steroid injections to alleviate Whitworth's pain. Whitworth first received a steroid injection more than nine months after he arrived at South Central, and nearly two years after he entered the defendants' care.

Based on the record as a whole, the court finds that there are genuine issues of material fact regarding whether the delays Whitworth experienced rise to the level of Eighth Amendment violations, either because they reflect non-medical delays in treating a known serious medical need or because they reflect the repeated provision of easier and less effective medical treatment for a

serious medical condition. *Darrah*, 865 F.3d at 372 (citations omitted). A reasonable jury could find that Whitworth's previously diagnosed, ongoing, and painful cervical spinal problems were sufficiently serious. The record evidence does not include any medical reason why, for nearly two years, Whitworth was not allowed to see any doctor and was given only occasional painkillers and ice instead of the physical therapy and steroid injections later deemed medically necessary and appropriate for his condition. A question of fact thus exists as to that reason.

The defendants' arguments to the contrary miss the mark. CCS argues that Whitworth cannot show a sufficiently serious medical need under Eighth Amendment standards, but fails to point to any record evidence in support of that argument. (Doc. No. 78, PageID# 1335–36.) Both CCS and CCI point to their written policies as evidence that they do not have policies or customs of inaction in response to Eighth Amendment violations, but Whitworth's theory of liability turns on *unwritten* policies and customs. In any event, CCS's and CCI's written policies are the very same TDOC policies that the TDOC itself found the defendants habitually violated at Trousdale during Whitworth's incarceration there.

CCI also argues that "the only incident to which Whitworth points to establish the existence of such a custom is his own," and that such evidence is insufficient as a matter of law. (Doc. No. 84, PageID# 1504; *see also* Doc. No. 120, PageID# 2446–47.) That argument fails because, if nothing else, it is factually incorrect. In addition to the medical records and testimony spanning numerous incidents across two different CCI facilities over the course of two years, Whitworth points to the TDOC audit report, which found that the defendants did indeed have a custom of disregarding their written policies regarding access to medical care at Trousdale and at least one other CCI facility during the time Whitworth was in their care. Moreover, contrary to the defendants' arguments, Whitworth's Eighth Amendment claims go beyond mere disagreement

with the treatment he received. Whitworth's claims encompass the nearly two-year period in which it appears that he may have received easier, less effective treatment for a serious medical condition, and experienced dramatic delays in receiving effective and appropriate treatment for that condition, based on what appear to be non-medical reasons.

Whitworth has therefore shown that genuine issues of material fact exist as to the first prong of the inaction inquiry.

### ii.        Notice or constructive notice

Neither CCI nor CCS appears to argue that it lacked notice of this pattern of potential Eighth Amendment violations. Based on the grievance that Whitworth exhausted while at Trousdale and the TDOC audit, the court concludes that there is at least a genuine question of material fact as to whether CCI and CCS were on notice of the pattern of medical delay.

### iii.        Municipal deliberate indifference

The third prong of the inaction theory analysis asks whether the defendants tacitly approved the unconstitutional conduct, "'such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction[.]'" *Thomas*, 398 F.3d at 429 (quoting *Doe*, 103 F.3d at 508). This municipal deliberate indifference standard, which derives from the Supreme Court's opinion in *Canton*, is not to be confused with the deliberate indifference standard for determining Eighth Amendment violations by individual actors. In *Farmer v. Brennan*, the Supreme Court explained that, "while deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability, the 'term was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible'" for constitutional violations. 511 U.S. at 841 (first citing *Wilson v. Seiter*, 501 U.S. 294, 299–300 (1991); and then quoting *Collins v. Harker Heights*, 503 U.S. 115, 124 (1992)). Under *Canton*, municipal "'deliberate indifference' is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of [its] action." *Bryan Cty.*, 520 U.S. at 410; *see also Doe*, 103 F.3d at 508 ("'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [constitutional violations]."). Unlike the Eighth Amendment deliberate indifference standard for individuals, the *Canton* municipal liability standard is purely objective. *Farmer*, 511 U.S. at 841 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective."); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) ("The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry."); *see id.* (first discussing *Canton*, 489 U.S. at 390–96; and then discussing *Farmer*, 511 U.S. at 841). "Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004) (citation omitted); *see Ford*, 535 F.3d at 486 (discussing jury finding that county's policies exhibited deliberate indifference to plaintiff's medical needs).

CCI and CCS both argue that they were not deliberately indifferent under the Eighth Amendment standard as it applies to individual defendants, but neither addresses the question of municipal deliberate indifference at issue here. (*See* Doc. Nos. 78, 84, 120, 124.) The court finds that there is sufficient record evidence for reasonable jurors to find that the defendants disregarded known or obvious consequences of tolerating the patterns of conduct described above, displaying what amounts to an official policy of deliberate indifference to the Eighth Amendment rights of incarcerated persons in their care, including Whitworth.

### iv.     Moving force or direct causal link

The defendants both suggest that Whitworth cannot show that their customs or policies were the moving force behind the alleged Eighth Amendment violations, but neither defendant

cites any affirmative record evidence supporting its position or the specific absence of record evidence supporting Whitworth's position. (Doc. No. 78, PageID# 1343; Doc. No. 84, PageID# 1504–05.) Such offhand and unsupported arguments are insufficient to prevail on summary judgment motions. *See Rodgers*, 344 F.3d at 595. Viewing the record evidence in the light most favorable to Whitworth, a reasonable jury could conclude that there was a direct causal link between the defendants' custom or policy of inaction in response to potential Eighth Amendment violations and the violations Whitworth claims to have suffered. Reasonable minds could also find a direct causal link between the defendants' custom or policy of inaction and Whitworth's physical injuries, pain, and suffering, including his August 2016 spinal injury and the severe pain and numbness that led to anxiety, stress, and high blood pressure.

Accordingly, the defendants have not shown that they are entitled to summary judgment on Count One.

### b.    Count Two: Failure-to-Train Theory

To prevail on a failure-to-train theory of municipal liability, the government entity's "failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original) (quoting *Canton*, 489 U.S. at 388). In that circumstance, a failure to train may "'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Connick*, 563 U.S. at 61 (quoting *Canton*, 489 U.S. at 389); *see Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) ("Only when the failure to train amounts to 'deliberate indifference' on behalf of the city toward its inhabitants . . . will failure to train lead to city liability under § 1983."). Once again, it is the objective *Canton* municipal deliberate indifference standard that applies. *Bryan Cty.*, 520 U.S. at 410 ("As our decision in *Canton* makes clear, 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal

actor disregarded a known or obvious consequence of [its] action."). And, as with any claim for municipal liability under Section 1983, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.

Whitworth may demonstrate that CCI and CCS are liable for failure to provide employees with adequate training in one of two ways. He "can show '[a] pattern of similar constitutional violations by untrained employees'" along with CCI's and CCS's "'continued adherence to an approach that [they] know[ ] or should know has failed to prevent tortious conduct by employees . . . .'" *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (quoting *Connick*, 563 U.S. at 62); *see Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (holding that "a conclusion of deliberate indifference" is justified in the failure-to-train context "where the city fails to act in response to repeated complaints of constitutional violations by its officers"). Alternatively, he "can establish 'a single violation of federal rights, accompanied by a showing that [CCI and CCS] ha[ve] failed to train [their] employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Shadrick*, 805 F.3d at 739; *see Brown*, 172 F.3d at 931 (holding that a municipal entity's "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction" is sufficient to "justify a conclusion of deliberate indifference"). This second form of proof is only "available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Shadrick*, 805 F.3d at 739 (quoting *Bryan Cty.*, 520 U.S. at 409). In *Shadrick v. Hopkins County*, the Sixth Circuit considered evidence that LPN nurses working for a private contract medical provider in a county jail "lack[ed] any authority to diagnose medical conditions" and evidence that the same LPNs had a "blanket inability . . . to identify and discuss the requirements of [the private company's] written policies

governing their work." *Id.* at 740. Against that backdrop, the Sixth Circuit held that "[i]t is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates." *Id.* Accordingly, failure to train prison medical staff may fall within the "narrow range of circumstances" for which the second avenue of proof is available.

Here, it is not clear which avenue of proof Whitworth intends to pursue. His amended complaint alleges that "Defendants['] refusal to correct the lack of medical care even when confronted by hundreds, if not thousands of medical request and grievances at [Trousdale] and [South Central] is clear evidence of failure to train." (Doc. No. 68, PageID# 1169.) In support of its motion for summary judgment, CCS has submitted copies of its written policies that appear to require employee training regarding the provision of medical care. (Doc. Nos. 77-15, 77-16.) CCI has submitted declarations from officials at Trousdale and South Central describing the number of hours of training CCI provides its employees and stating that the training is "designed and intended to educate employees to identify inmates with medical needs, to provide inmates with immediate medical assistance as required, and to provide inmates with timely access to medical treatment as required." (Doc. No. 85, PageID# 1688; Doc. No. 86, PageID# 1850.) Whitworth has not directly disputed the existence of the defendants' purported training programs. He argues only that his "personal experience with the Defendants' staff [who were] unable to properly process his medical referrals from multiple nurses and medical providers show clear evidence of failure to train." (Doc. No. 114, PageID# 2247.) Whitworth has not pointed to any additional record evidence regarding training, and the court is not aware of any.[16]

---

[16]     While Whitworth implies that others incarcerated at Trousdale and South Central submitted medical requests or grievances regarding lack of access to medical care, there is no evidence in the record in this case regarding such requests or grievances.

It therefore appears that Whitworth is asking the court to infer—based on his experiences with the defendants' employees alone—that the constitutional violations alleged here took place because CCI and CCS failed to train their employees. In other words, Whitworth argues that, if CCI and CCS had adequately trained their employees regarding the provision of medical care, the Eighth Amendment violations he alleges would not have taken place. Without more, Whitworth's failure-to-train theory cannot survive summary judgment. *See Canton*, 489 U.S. at 391 (holding that, in the failure-to-train context, it is insufficient "to prove that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him [or her] to avoid the particular injury-causing conduct"). This is, in part, because such an inferential argument ignores the required showing of "a direct causal link between" a custom or policy of failing to train employees and the constitutional deprivations alleged. *Id.* at 385; *see also id.* at 390–91 ("That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipal entity], for the [employee's] shortcomings may have resulted from factors other than a faulty training program.").

The court therefore finds that there is no genuine dispute of material fact regarding Whitworth's failure-to-train theory of liability. The defendants are entitled to summary judgment with respect to Count Two.

## V.  Conclusion

For the foregoing reasons, CCI's and CCS's motions for summary judgment (Doc. Nos. 77, 81) will be denied in part and granted in part.

An appropriate order will enter.

ENTERED this 29th day of March 2019.

ALETA A. TRAUGER
United States District Judge